*Decision will be entered under Rule 50.*

WESLEY HEAT TREATING CO., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

SPINDLER METAL PROCESSING CO., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

WESLEY STEEL TREATING CO., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 58828, 58829, 58830.   Filed April 14, 1958.

*Harvey W. Peters, Esq., William A. Jackson, Esq.,* and *Dudley J. Godfrey, Jr., Esq.,* for the petitioners.
*John E. Owens, Esq.,* for the respondent.

TIETJENS, *Judge:* The Commissioner determined deficiencies in petitioners' income tax, excess profits tax, and declared value excess-profits tax, and made additions to the tax for negligence under section 293 (a) of the Internal Revenue Code of 1939, as follows:

| Docket No. | Year | Kind of tax | Deficiency | Additions to tax sec. 293 (a) |
|---|---|---|---|---|
| 58828 | 1944 | Income | $3,384.26 | |
| | | Excess profits | 14,766.18 | |
| | | Declared value excess-profits | 1,117.56 | |
| | 1945 | Income | 3,408.07 | |
| | | Excess profits | 305.20 | |
| | 1946 | Income | 1,933.75 | |
| 58829 | 1944 | Income | 3,955.37 | |
| | | Excess profits | 17,104.03 | |
| | | Declared value excess-profits | 2,007.38 | |
| | 1945 | Income | 3,139.51 | |
| | 1946 | Income | 2,513.68 | |
| 58830 | 1941 | Income | 15,402.23 | $770.11 |
| | | Excess profits | 23,032.58 | 1,151.63 |
| | | Declared value excess-profits | 6,762.96 | 338.15 |
| | 1942 | Excess profits | 135,288.20 | 6,764.41 |
| | | Declared value excess-profits | 6,367.69 | 318.38 |
| | 1943 | Income | 4,594.79 | 229.74 |
| | | Excess profits | 119,680.07 | 5,984.00 |
| | | Declared value excess-profits | 3,302.41 | 165.12 |
| | 1944 | Income | 3,449.26 | 172.46 |
| | | Excess profits | 34,159.20 | 1,707.96 |
| | | Declared value excess-profits | 146.52 | 7.33 |
| | 1945 | Income | 2,547.40 | 127.37 |
| | | Excess profits | 56,268.27 | 2,813.41 |
| | | Declared value excess-profits | 1,614.79 | 80.74 |
| | 1946 | Income | 27,998.73 | 1,399.94 |

The parties have stipulated the extent to which certain items disallowed as deductions by the Commissioner are properly deductible by the petitioners. There remain two issues for decision: (1) Whether petitioners' contributions during the years 1941 through 1946 to certain profit-sharing trusts, established for the benefit of their employees, are allowable deductions within the meaning of section 23, and (2) whether petitioner Wesley Steel Treating Co. is liable for additions to the tax for negligence under section 293 (a) for each of the years 1941 through 1946.

### FINDINGS OF FACT.

Some of the facts are stipulated. The stipulated facts and pertinent exhibits are found as stipulated and are incorporated herein by reference.

The petitioner in Docket No. 58830 is Wesley Steel Treating Co., hereinafter referred to as Steel, a Wisconsin corporation with its principal office located in Milwaukee, Wisconsin. Steel filed its tax returns for the years 1941 through 1946 with the collector of internal revenue for the district of Wisconsin.

The petitioner in Docket No. 58828 is Wesley Heat Treating Co., hereinafter referred to as Heat, a Wisconsin corporation with its principal office located in Manitowoc, Wisconsin. Heat filed its tax returns for the years 1943 through 1946 with the collector of internal revenue for the district of Wisconsin.

The petitioner in Docket No. 58829 is Spindler Metal Processing Co., hereinafter referred to as Metal, a Wisconsin corporation incorporated under the name Wesley Metal Treating Company. Metal's name was changed to its present name in the year 1944. Metal's principal office is located in Racine, Wisconsin. Metal filed its tax returns for the years 1944 through 1946 with the collector of internal revenue for the district of Wisconsin.

Steel, Heat, and Metal are related in that in addition to being in the same business, they have had common stockholders and officers.

Steel, Heat, and Metal keep their books and report their income for income tax purposes on a calendar year, accrual method of accounting basis. Their tax returns for the years in issue were filed on that basis.

Steel, Heat, and Metal were engaged in the business of processing or heat-treating steel for various manufacturers of steel products during the years in issue. They received metallic materials in a semifinished state from customers for hardening, softening, drawing, or otherwise treating. The cost of heat treating generally represented only a small part of the cost of the customer's material.

The work in the heat-treating plants was dirty and unpleasant due to dust, dirt, grime, and heat. Most of the employees of Steel, Heat, and Metal were skilled workers.

During the 1920's Steel established the practice of sharing profits with its employees. Generally the employees were paid a base salary and received extra compensation in the form of bonuses based upon a share of Steel's profits.

On or about December 31, 1940, a trust instrument purporting to establish a fund, hereinafter referred to as Trust A, was executed by Steel and certain individuals designated as trustees. It provided, *inter alia*, that Steel transfer $13,500 to the trustees to be held in trust for the benefit of the employees and distributed, in full, to such employees of Steel as they saw fit to select, during the year 1941. As required by the trust instrument, the trustees distributed the $13,500 to Steel's employees during 1941.

A trust instrument dated December 30, 1941, purporting to establish a fund, hereinafter referred to as Trust B, was executed by Steel and certain individuals designated as trustees. It stated:

MEMORANDUM OF AGREEMENT made and entered into this 30th day of December, 1941, by and between the WESLEY STEEL TREATING COMPANY, hereinafter for convenience referred to as the Company, and Micheal Strzeminski, Anna Gough, Catherine Hauer, Paul C. Hushek, Arthur H. Nuesse, hereinafter for convenience referred to as the trustees.

For and in consideration of the covenants hereinafter contained, the company does, coincident with the execution of this agreement, transfer and pay to the

trustees the sum of Seventy-Five Thousand and no/100____Dollars ($75,000.00) dollars, the receipt of which is hereby acknowledged, to be held by the said trustees in trust for the benefit of the employees of the company for the following uses and purposes, to-wit:

It is understood and agreed that the fund created and received by the trustees hereunder shall constitute an irrevocable trust and shall be used and administered for the benefit of such employees of the company as may be entitled to receive proceeds and avails hereunder in the sole judgment and discretion of the trustees.

The funds held by the trustees shall from time to time, during the year 1942, if possible, and subject to the final clause of this paragraph be paid to such employees of the company as they may see fit to select, in such installments in such amounts as may in their discretion be advisable, provided however, that the entire trust fund of Seventy-Five Thousand and no/100_____ ($75,000.00) dollars, shall be paid to said employees within and during the year 1942, unless in the judgment of the trustees it shall be inadvisable so to do by reason of extreme changes in the National economy, war, riot, civil commotion, or act of God, or other unusual circumstance.

Payments made out of said trust fund to employees shall be considered to be in the nature of a bonus, and shall have no relation to any regular wage or pay scales of the company and shall not be in any manner construed to constitute any advance or alteration of any kind in any established wage scale.

The trustees shall act without compensation for their services as such trustees, but they shall not be barred or restrained from sharing in any distribution of the proceeds of the trust fund as employees of the company, and any one of said trustees shall have full power and authority to disburse funds for the purposes hereinabove stated without joinder of the other trustees.

Dated at Milwaukee, Wisconsin this 30th day of December, 1941.

Trust instruments dated December 30, 1942, and December 31, 1943, 1944, 1945, and 1946, purporting to establish funds, hereinafter referred to as Trusts C, D, E, F, and G, were executed by Steel and various individuals designated as trustees. The trust instruments were substantially identical in content with the trust instrument dated December 30, 1941, except that the corpus recited was different each year. The corpora were as follows:

| Trust | Year | Amount |
|---|---|---|
| C | 1942 | $150,000 |
| D | 1943 | 153,000 |
| E | 1944 | 45,000 |
| F | 1945 | 67,500 |
| G | 1946 | 70,000 |

The determination of the amount of profit to be shared with the employees was made by Steel's officers and directors at a meeting held during the latter part of each year. They estimated the profit for each year with the aid of trial balances prepared by the bookkeeping department.

Steel's books of account show that on or about December 31 of each of the years 1941 through 1946, entries were made to record a con-

tribution of the share of profits to the particular trust established for those years in the following amounts:

| Trust | Year | Amount |
|---|---|---|
| B | 1941 | $75,000 |
| C | 1942 | 150,000 |
| D | 1943 | 153,000 |
| E | 1944 | 45,000 |
| F | 1945 | 67,500 |
| G | 1946 | 70,000 |

The contributions to the trusts in 1941, 1942, 1943, and 1944 were in the form of checks, dated December 31, drawn by Steel in the names of the trustees which checks were endorsed by the trustees and returned to Steel in exchange for shares of stock in Steel and/or Heat and/or Metal, except that in 1942 the trust retained $11,300 in cash and in 1943 it retained $2,400 in cash. The stock of Steel, Heat, and Metal was exchanged at the rate of $100 per share.

The contributions to the trusts in 1945 and 1946 were in the form of Steel's notes payable to the trustees. The 1945 note was discharged by payment to the trustees in cash in full during 1946 and the 1946 note was discharged by payment to the trustees in cash in the amount of $51,000 during 1947 and in the amount of $19,000 during 1948.

The aggregate amount of the checks or notes drawn or made in favor of the trustees at the end of each of the years 1941 through 1946 was shown on Steel's books as expenses in determining profit and was claimed as salaries and wages expense by Steel on its respective tax returns for the years 1941 through 1946.

The stocks which Steel exchanged with the trustees for their endorsed checks were purchased by Steel, in varying amounts, from the following: Roy N. Spindler, Joseph F. Wesley, Charles I. Wesley, the various trustees of the Steel, Heat, and Metal profit-sharing trusts, Heat, Metal, and an unnamed source.

During the taxable years involved Roy N. Spindler was the president of Metal, Joseph F. Wesley was the president of Heat, and Charles I. Wesley was the president of Steel.

The books of the trust show the establishment of Trust B by the following entry:

12/31/41
Wesley Steel Treating Co. Trust "B" $75,000.00 Trust Payable_____ $75,000.00

Similar entries were made in the books of the trust when Trusts C, D, E, F, and G were established, except the amounts of the trusts differed.

The books of the trust show the following entry to record the receipt of the stock by the trustees of the B trust:

12/31/41

"B" Trust Stocks—

| | | | |
|---|---|---|---|
| A. H. Neusse, Tr | 150 Sh W. Steel | $15,000.00 |
| A. Gough, Tr | 150 Sh W. Steel | 15,000.00 |
| C. Hauer, Tr | { 100 Sh W. Steel | 10,000.00 |
| | 50 Sh W. Steel | 5,000.00 |
| M. Strzeminski, Tr | 150 Sh W. Heat | 15,000.00 |
| Paul Hushek, Tr | 150 Sh W. Heat | 15,000.00 |
| Net Worth | | 75,000.00 |

Similar entries were made in the books of the trust to record the receipt of the stock by the trustees of the C, D, and E trusts. Similar entries were also made in the books of the trust to record the accounts receivable from Steel by the F and G trusts.

The books of Trusts B, C, D, E, F, and G show that the amounts contributed to such trusts by Steel were distributed to the employees of Steel in the years and in the aggregate amounts indicated below:

| Trust | 1942 | 1943 | 1944 | 1945 | 1946 | 1947 | 1948 | Total |
|---|---|---|---|---|---|---|---|---|
| B | $55,709.83 | $19,290.17 | | | | | | $75,000 |
| C | | 49,807.50 | $100,192.40 | | | | | 150,000 |
| D | | | 30,212.51 | $115,700.17 | $7,087.32 | | | 153,000 |
| E | | | | | 45,000.00 | | | 45,000 |
| F | | | | | 45,536.70 | $21,963.30 | | 67,500 |
| G | | | | | | 38,224.58 | $31,775.42 | 70,000 |

The money distributed by Trusts B, C, D, and E, as shown above, was acquired by the respective trusts from the sale of Steel, Heat, or Metal stock to Steel and/or Heat and/or Metal and/or other trusts, and from the cash paid to them by Steel.

In December of the years 1942, 1943, 1944, 1945, and 1946, Steel paid a bonus to its employees in an amount which was equal to approximately 10 per cent of the employees' compensation received during the first 10 months of each of those years. These bonuses were in addition to the distributions made to Steel's employees from the profit-sharing trusts.

The books of Trusts B, C, D, E, F, and G, show that distributions made to Steel's employees from such trusts were all made in years subsequent to the year the respective trust instruments were dated and in some instances distributions were made by each trust to employees who were not in the employ of Steel during the year the trust instruments were dated. There were also some individuals who were in the employ of Steel in the year a trust instrument was dated who left the employ of Steel prior to the time distributions were made from such trusts and no distribution was made to them from such trusts.

The purpose of Trusts A, B, C, D, E, F, and G, was to establish a fund through which employees of Steel would receive additional compensation. It was contemplated that each trust would have a duration of 1, 2, or 3 years, but no longer than 3 years.

New employees were told prior to being hired that they would receive a regular salary and after a 3-month waiting period they would be entitled to receive weekly distributions under a profit-sharing arrangement, which, assuming there were profits, would be set up at the end of each year. In general, the employees never knew how much had been contributed to the trusts at the end of the year and how much was available for distribution.

Steel classified its employees into two groups—Group A and Group B. The classification was based on the employee's length of employment, job responsibility, general attitude of the individual employee and his worth to Steel. An employee's classification did not change during the year.

The classification into Group A or Group B determined in part the amount which the trusts would distribute to the employee; for example, during 1942 Group A employees received a Government bond every month and 8 additional bonds at Christmas, while Group B employees received a Government bond every other month and 4 additional bonds at Christmas.

The Group A and Group B employees also received weekly distributions from the trusts. Originally those distributions were in the form of cash placed in envelopes, but later they were in the form of checks. All Group A employees did not receive the same amount of weekly distribution, nor did all Group B employees receive the same amount of weekly distribution. However the weekly distribution to a particular employee remained the same throughout each year. The weekly payments ranged from $2 a week to $15 a week. The amount of each weekly payment to be made to the Group A and Group B employees was determined by the trustees near the end of the year or shortly after the beginning of a year so that the weekly distributions could begin as of the first week in January. In addition to the weekly distributions the Group A and Group B employees received Government bonds periodically and at Christmas.

The total amounts shown above as distributed to the employees of Steel from Trusts B, C, D, E, F, and G, were not in fact totally distributed directly to the employees. Some of this money was used to make payments to charitable organizations such as the Red Cross and Community Chest; some was used to pay for hospitalization plans; and some was used for other purposes such as purchasing flowers for sick employees. These amounts were charged to each

employee on a pro rata basis depending on the employee's status in Steel.

It was understood by the trustees that the maximum distribution to be made from any one trust to an officer or employee of Steel in any one year was $5,000. With one exception, this rule appears to have been strictly adhered to by the trustees.

Trust instruments dated December 31, 1944, 1945, and 1946, purporting to establish funds, hereinafter referred to as Trusts E, F, and G, were executed by Heat and Donald A. Petrie, as trustee. Petrie was secretary of Heat during the taxable years involved herein. The trust instruments were substantially identical in content with the trust instrument executed by Steel and dated December 30, 1941 (set out above), except that the corpus recited was different each year. The corpora of the trusts were as follows:

| Trust | Year | Amount |
|---|---|---|
| E | 1944 | $46,000 |
| F | 1945 | 10,000 |
| G | 1946 | 10,500 |

Heat's books of account show that on or about December 31 of each of the years 1944 through 1946, entries were made to record a contribution of the share of profits to the particular trust established for those years in the above amounts.

Heat's contribution to Trust E in 1944 was in the form of 3 checks dated May 29, 1944, August 31, 1944, and December 31, 1944, drawn by Heat in the name of the trustee, in the respective amounts of $10,000, $3,000, and $10,000. The two $10,000 checks were endorsed by the trustee and returned to Heat in exchange for shares of stock of Heat and Steel. Such stock was exchanged at the rate of $100 per share. The trustee retained $3,000 in cash. Further contributions were made by Heat during 1944 in the form of 110 shares of Steel stock and 120 shares of its own stock, which were valued at $100 per share.

The $46,000 contributed to Trust E in the form of cash and stocks was claimed as a salaries and wages expense by Heat on its 1944 income tax return.

Heat's contribution to Trust F in 1945 was in the form of 50 shares of Metal stock, which were valued at $100 per share. Further contributions to Trust F in 1945 were made by Heat in the form of its notes payable to the trustee in the amount of $4,040.20, which were discharged by payment to the trustee during 1946. On December 31, 1945, Heat drew a check payable to Joseph F. Wesley in the amount of $5,959.80. Heat debited $959.80 to "Salary-Fund F" account.

The $10,000 contributed to Trust F in the form of stock, notes, and the $959.80 paid to Joseph Wesley was claimed as a salaries and wages expense by Heat on its 1945 income tax return.

Heat's books of account show that on December 31, 1946, an entry was made debiting Trust G for $10,500 and crediting Wesley Heat trust "c/o Rec. for $3,000" and Wesley Heat trust "c/o Pay. for $7,500." The $10,500 was claimed as a salaries and wages expense by Heat on its 1946 income tax return.

Heat paid $3,000 to Trust G in 1946 and $7,500 in 1947.

Separate books of account were maintained for Trusts E, F, and G and appropriate entries were made in the separate trust books to record the establishment of the trusts and the receipt of the amounts contributed to the trusts by Heat in the form of cash, stock, notes, and accounts receivable.

The books of Trusts E, F, and G show that the amounts contributed to such trusts by Heat were distributed to the employees of Heat in the years and in the aggregate amounts indicated below:

| Trust | 1944 | 1945 | 1946 | 1947 | Total |
|-------|------|------|------|------|-------|
| E | $15,035.86 | $25,529.16 | $5,434.98 | | $46,000 |
| F | | | 10,000.00 | | 10,000 |
| G | | | 2,477.03 | $8,022.97 | 10,500 |

The money distributed by Trusts E, F, and G, as shown above, was acquired by the respective trusts from the sale of Steel, Heat, or Metal stock to Steel and/or Heat and/or Metal and/or other trusts, and from the cash paid to them by Heat.

In December of the years 1944, 1945, and 1946, Heat paid a bonus to its employees in an amount which was equal to approximately 10 per cent of the employee's compensation received during the first 10 months of each of those years. These bonuses were in addition to the distributions made to Heat's employees from the profit-sharing trusts.

The books of Trusts E, F, and G show that distributions made to Heat's employees from such trusts were in whole or in part made in years subsequent to the year the respective trust instruments were dated and in some instances distributions were made by each trust to employees who were not in the employ of Heat during the year the trust instruments were dated. There were also some individuals who were in the employ of Heat in the year a trust instrument was dated who left the employ of Heat prior to the time distributions were made from such trusts and no distribution was made to them from such trusts.

As a general rule, Trusts E, F, and G established for the employees of Heat, were administered and distributed in a manner identical to the trusts established for the employees of Steel.

Trust instruments dated December 31, 1944, 1945, and 1946, purporting to establish funds, hereinafter referred to as Trusts E, F, and G, were executed by Metal and Robert H. Steuber as trustee. Steuber was secretary of Metal during the taxable years involved herein. The trust instruments were substantially identical in content to the trust instrument executed by Steel and dated December 30, 1941 (set out above), except that the corpus recited was different each year. The corpora of the trusts were as follows:

| Trust | Year | Amount |
|-------|------|--------|
| E | 1944 | $38,000 |
| F | 1945 | 10,000 |
| G | 1946 | 10,500 |

Metal's books of account show that on or about December 31 of each of the years 1944 through 1946, entries were made to record a contribution of the share of profits to the particular trust established for those years in the above amounts.

Metal's contribution to Trust E in 1944 was in the form of 180 shares of its own stock transferred to the trustee on November 30, 1944, at a value of $100 per share. Metal made a further contribution to Trust E on December 31, 1944, in the form of a check drawn by Metal in the name of the trustee, which check was endorsed by the trustee and returned to Metal in exchange for 200 shares of its stock. The $38,000 contribution to Trust E in the form of cash and stocks was claimed as a salaries and wages expense by Metal on its 1944 income tax return.

Metal's contribution to Trust F in 1945 was in the form of 10 shares of its own stock transferred to the trustee on November 30, 1945, at a value of $100 per share. Metal made a further contribution to Trust F on December 31, 1945, in the form of its notes payable to the trustee in the amount of $9,000, which were discharged by payment to the trustee in 1946. The $10,000 contribution to Trust F in the form of stock and notes was claimed as a salaries and wages expense by Metal on its 1945 income tax return.

Metal's contribution to Trust G in 1946 was in the form of its notes payable to the trustee in the amount of $10,500, which were discharged by payment to the trustee in 1947. The $10,500 contribution to Trust G in the form of notes was claimed as a salaries and wages expense by Metal on its 1946 income tax return.

Separate books of account were maintained for Trusts E, F, and G and appropriate entries were made in the separate trust books to record the establishment of the trusts and the receipt of the amounts contributed to the trusts by Metal in the form of cash, stock, and notes.

The books of Trusts E, F, and G show that the amounts contributed to such trusts by Metal were distributed to the employees of Metal in the years and in the aggregate amounts indicated below:

| Trust | 1944 | 1945 | 1946 | 1947 | 1948 |
|---|---|---|---|---|---|
| E | $2,494.66 | $19,683.83 | $15,821.51 | | |
| F | | | 2,969.89 | $7,030.11 | |
| G | | | | 4,016.41 | $6,483.59 |

The totals for Trusts E, F, and G are $38,000, $10,000, and $10,500, respectively.

The money distributed by Trusts E, F, and G, as shown above, was acquired by the respective trusts from the sale of Metal stock to Steel and/or Heat and/or Metal and/or other trusts and from the cash paid to them by Metal.

In December of the years 1944, 1945, and 1946, Metal paid a bonus to its employees in an amount which was equal to approximately 10 per cent of the employee's compensation received during the first 10 months of each of those years. These bonuses were in addition to the distributions made to Metal's employees from the profit-sharing trusts.

The books of Trusts E, F, and G show that distributions made to Metal's employees from such trusts were in whole or in part made in years subsequent to the year the respective trust instruments were dated and in some instances distributions were made by each trust to employees who were not in the employ of Metal during the year the trust instruments were dated. There were also some individuals who were in the employ of Metal in the year a trust instrument was dated who left the employ of Metal prior to the time distributions were made from such trusts and no distribution was made to them from such trusts.

As a general rule, Trusts E, F, and G, established for the employees of Metal, were administered and distributed in a manner identical to the trusts established for the employees of Steel.

The amounts paid to each employee of Steel, Heat, and Metal as wages in a given year plus the distributions to the employees from the trusts in those years are not excessive compensation and are reasonable compensation. The contributions to the trusts were also reasonable in amount in the years the contributions were made.

Once an employee commenced receiving weekly payments from the profit-sharing trusts of Steel, Heat, or Metal, he would continue to receive such payments as long as he continued employment with Steel, Heat, or Metal. Once he left such employ he forfeited his right to receive any further payments.

The Commissioner disallowed as deductions the amount of the contributions made by Steel to its profit-sharing trusts denominated B, C, D, E, F, and G, and claimed as a salaries and wages expense on its tax returns for the years in which the trust instruments were dated. The Commissioner's explanation of his action contained in the statutory notice of deficiency was as follows:

It has been determined that the amount of * * * allegedly representing an accrued contribution to a trust created for the benefit of your employees, which was included in the deduction claimed for compensation on your return for the year * * * does not represent ordinary and necessary business expense incurred during that year, does not represent a proper accrual for that year, was not paid to a trust exempt under section 165 (a), and is not an allowable deduction under sections 23 (a), 23 (p) or any other section of the Internal Revenue Code of 1939. Your income for the year * * * is adjusted accordingly.

The Commissioner disallowed as deductions, except to the extent indicated below, the amount of the contributions made by Heat and Metal to their profit-sharing trusts denominated E, F, and G, and claimed by them as a salaries and wages expense on their tax returns for the years the trust instruments were dated.

The Commissioner allowed Heat deductions of $15,035.86 and $2,477.03 for the years 1944 and 1946, respectively, which represented amounts contributed to its Trusts E and G, whose trust instruments were dated December 31, 1944 and 1946, respectively, and which amounts were in fact distributed to its employees by the trusts during those years.

The Commissioner allowed Metal a deduction of $2,494.66 for the year 1944 which represented an amount contributed to its Trust E, whose trust instrument was dated December 31, 1944, and which amount was in fact distributed to its employees by the trust during that year.

Steel's contribution to Trust B together with the wages earned by Steel's employees during 1941 constituted reasonable compensation to them for services rendered that year.

Steel's employees' rights in Steel's contributions to its profit-sharing trusts denominated C, D, E, F, and G, were not nonforfeitable at the time Steel paid the contributions to those trusts.

Heat's employees' rights in Heat's contributions to its profit-sharing trusts denominated E, F, and G, were not nonforfeitable at the time Heat paid the contributions to those trusts.

Metal's employees' rights in Metal's contributions to its profit-sharing trusts denominated E, F, and G, were not nonforfeitable at the time Metal paid the contributions to those trusts.

An examination or audit of Steel's books and records was made for each of the years 1941 through 1946 by a firm of public account-

ants licensed under the laws of Wisconsin. This firm also prepared the tax returns filed by Steel during each of those years.

OPINION.

Petitioners contend that the amounts they accrued as expense each year at the time they made contributions to the employees' trusts were proper accruals deductible as wages and salaries under section 23 (a) (1) (A). Alternatively, petitioners maintain that in any event they are entitled to a deduction of the amounts paid to the employees from the trusts each year if we decide that petitioners cannot accrue the expense in the year they made their contributions.

The Commissioner's position, in general, is that the contributions made by petitioners to the trusts were made pursuant to a plan deferring the receipt of compensation within the meaning of section 23 (p), as amended, and inasmuch as the employees' rights in such contributions were not nonforfeitable petitioners are not entitled to deduct such contributions as expenses either on an accrual or a cash paid basis. Alternatively, the Commissioner contends that in no event are petitioners' contributions deductible on the accrual basis, since petitioners allegedly incurred no fixed liability to make payments to their employees in the amounts claimed on their tax returns.

It is well established that for taxable years beginning before January 1, 1942, contributions to trusts which were not deductible under the specific provisions of section 23 (p) might nevertheless be deductible as ordinary and necessary business expenses under the general provisions of section 23 (a). *Phillips H. Lord*, 1 T. C. 286 (1942); *Gisholt Machine Co.*, 4 T. C. 699 (1945); *Forcum-James Co.*, 7 T. C. 1195 (1946); *Alvin Glen Hall*, 7 T. C. 1220 (1946). However, the Revenue Act of 1942 amended section 23 (p), and it is now settled that for taxable years beginning after December 31, 1941, contributions to profit-sharing plans or payments made under a plan deferring the receipt of compensation are deductible, if at all, only under section 23 (p).[1] *Tavannes Watch Co.* v. *Commissioner*, 176 F. 2d 211 (C. A. 2, 1949), reversing 10 T. C. 544; *Times Publishing Co.*, 13

---

[1] H. Rept. No. 2333, 77th Cong., 2d Sess.:

"It has been decided that in the interest of clarification and administration of the tax laws *no deductions should be allowable under section 23 (a) for amounts paid into a pension trust, but all such deductions should be allowable only under section 23 (p).* [p. 105. Emphasis supplied.]"

The amendments made by the bill are intended to remedy the two most serious abuses of the pension trust provision as follows:

"*In addition, all methods of providing deferred compensation for employees, such as stock bonus and profit-sharing plans* and the purchase of annuity contracts directly from insurance companies, *as well as pension trusts proper, will be treated upon a similar basis.* [p. 51. Emphasis supplied.]"

T. C. 329, affirmed per curiam 184 F. 2d 376 (C. A. 3, 1950) ; *William M. Bailey Co.*, 15 T. C. 468, affirmed per curiam 192 F. 2d 574 (C. A. 3, 1951) ; *Jacob Lichter*, 17 T. C. 1111, affd. 201 F. 2d 49 (C. A. 6, 1952), certiorari denied 345 U. S. 942 (1953).

Section 23 (p), as amended by the Revenue Act of 1942, provides, *inter alia*, that if contributions are paid by an employer to or under a profit-sharing plan, or if compensation is paid or accrued on account of any employee under a plan deferring the receipt of such compensation, such contributions or compensation, if they meet the deductibility requirements of section 23 (a), are deductible, within certain limits, under section 23 (p) (1) (C), if the profit-sharing plan conforms to section 165 (a), or if it does not conform to that section, the contributions or compensation are deductible under section 23 (p) (1) (D) in the year paid, if the employees' rights to the payments are nonforfeitable at the time the contribution or compensation is paid.

Petitioners do not contend that the trusts here in issue were section 165 trusts and it is not necessary for us to examine the trust instruments from that standpoint.

The Commissioner argues that petitioners' contributions to their trusts were made pursuant to plans deferring the receipt of compensation. Petitioners' contention, as we understand it, is that the trusts here involved were not trusts subject to section 23 (p) at all, but were simply year-to-year payments of compensation deductible under section 23 (a) (1) (A) as ordinary and necessary business expenses. *Produce Reporter Co.*, 18 T. C. 69, affirmed on another issue, 207 F. 2d 586 (C. A. 7, 1953), is cited as authority for this contention. We think the record supports the Commissioner's determination. More is involved here than a current payment profit-sharing plan, i. e., where the amount of the bonus is determined toward the end of one year and payments to the employees are made during the year following, as was the case in *Produce Reporter.* In this case, petitioners, over the years had established the practice of sharing profits with their employees and during the taxable years trusts were established as a means for distributing the profits which petitioners' officers and directors determined should be shared. The procedure followed was basically the same for each year. A trust instrument was executed on or about December 31, specifying the amount of profits to be shared with the employees, and petitioners made contributions to the trust in the form of cash, stock, or notes. It was intended that the trust corpus would be distributed to petitioners' employees in the next 1, 2, or 3 years and such procedure was consistently followed. The contributions were intended to provide additional compensation to petitioners' employees for services rendered by the employees in the year the trust instruments were dated—

petitioners concede this on brief and it is consistent with their method of accounting for their contributions, i. e., a deduction for salaries and wages was taken in the year the trust instrument was dated to the extent of the corpus recited in the trust instrument. Although the trust instruments recited that the trust corpus was to be distributed in the year following, this was to be done only "if possible" and great latitude was allowed the trustees with respect to the time of distribution. While in a few instances distribution of the entire amount was made in the ensuing year, in most cases the amounts were spread over the next 2 or 3 years. We think this constitutes a profit-sharing or deferred compensation plan within the meaning of section 23 (p). Accordingly, following the cases cited above, the deductibility of such contributions or compensation is governed by section 23 (p) (1) (D), so far as taxable years beginning after December 31, 1941, are concerned. Thus, deductibility depends upon whether the employees' rights were nonforfeitable at the time the payments to the trusts were established. The employees' "rights" which must be nonforfeitable, are the rights of each individual employee beneficiary and not the rights of all employees as a class. *William M. Bailey Co.*, *supra*. There are no provisions in the trust instruments which vest nonforfeitable rights in petitioners' individual employees and petitioners concede that once an employee left their employ he forfeited his rights to receive any future payments from the trusts. We conclude that the employees' rights were not nonforfeitable at the time the contributions or compensation were paid to the trusts, and petitioners are therefore not entitled to deductions for payments to the trusts in any taxable year. Regs. 111, sec. 29.23 (p)–11.

We hold that Steel's contributions to its trusts designated C, D, E, F, and G, Heat's contributions to its trusts designated E, F, and G, and Metal's contributions to its trusts designated E, F, and G are not deductible by petitioners, except to the extent allowed by the Commissioner.

Insofar as Steel Trust B is concerned, the Commissioner argues that although the trust instrument establishing that trust was dated December 30, 1941, nevertheless, it should be assumed that the instrument was executed during 1942 since petitioners have not shown that the instrument was executed during 1941. Accordingly, the Commissioner argues, the 1942 amendment to section 23 (p) is applicable to Trust B and that trust should be treated in the same manner as the other trusts of Steel, Heat, and Metal.

The Commissioner's argument is not convincing. Although the testimony of Arthur Nuesse, the secretary and a director of Steel during the taxable years, and Charles Wesley does not indicate the exact date on which the trust instrument was executed, we think

this is not decisive of the issue. The amendment to section 23 (p) applies to taxable years beginning after December 31, 1941, yet Trust B is relevant to Steel's taxable year beginning January 1, 1941. Steel's contribution to Trust B was made during 1941 and Steel claimed a deduction for wages and salaries, as a result of the contribution, on its 1941 tax return. Assuming that the instrument establishing Trust B was actually executed during the early part of 1942, we fail to see how this can make the amendment to section 23 (p) apply to a taxable year beginning *before* January 1, 1942. The statute expressly provides that the amendment shall apply only to taxable years beginning *after* December 31, 1941. It appears from the record that Trust B came into existence (or was "materialized") before January 1, 1942. We think it is irrelevant that the actual trust instrument was executed subsequent to that time. Oral trusts of property other than real estate are enforcible in Wisconsin, *Hartman* v. *Loverud*, 227 Wisc. 6, 277 N. W. 641, and see *Dejay Stores* v. *Ryan*, 229 F. 2d 867 (C. A. 2, 1956).

The record establishes that the contribution by Steel to Trust B, together with the wages earned by Steel's employees during 1941, constituted reasonable compensation to employees for services rendered by them during that year, and since Steel's contribution was irrevocably paid to Trust B, it follows that the contribution ($75,000) is properly deductible by Steel under section 23 (a) as an ordinary and necessary business expense on its tax return for 1941. *Gisholt Machine Co., supra; Forcum-James Co., supra; Alvin Glen Hall, supra.*

The Commissioner determined additions to Steel's tax for each of the years 1941 through 1946 under section 293 (a). That section provides that an addition to tax totaling 5 per cent of the deficiency will be assessed if any part of that deficiency is due either to negligence or intentional disregard of rules and regulations without intent to defraud.

In our opinion the Commissioner erred in making the additions to Steel's tax for negligence. An examination or audit of Steel's books was made for each of the taxable years by a firm of public accountants who also prepared the tax returns filed by Steel during each of the years 1941 through 1946. A part of the deficiencies was due to the Commissioner's disallowance of miscellaneous deductions for alleged business expenses. The parties have stipulated the extent to which those items are properly deductible. The major part of the deficiencies resulted from the Commissioner's disallowance of deductions claimed by Steel for contributions to its profit-sharing trusts for each of the years 1942 through 1946. On its tax returns, Steel treated the contributions as reasonable compensation to its employees for

services rendered and therefore an accrued expense deductible under section 23 (a). Such treatment was proper insofar as Trusts A and B were concerned, but was not proper with respect to Trusts C, D, E, F, and G, because of the amendment to section 23 (p) which applied to taxable years beginning subsequent to December 31, 1941. The record demonstrates that the improper deductions were claimed by Steel in its honest belief that they were proper, accrued expenses. There was sufficient information disclosed in the returns to apprise the Commissioner of the nature of the claimed deductions and while good faith does not always negative negligence, *American Properties, Inc.*, 28 T. C. 1100, here, it would seem that if there was negligence, it consisted in the taxpayer's taking the position that the contributions were deductible as reasonable compensation to its employees, whereas, the Commissioner disagreed. It is our opinion that no part of the deficiencies in Steel's taxes for the years 1941 through 1946 was due to negligence or intentional disregard of rules and regulations. *Pullman, Inc.*, 8 T. C. 292, 299.

*Decisions will be entered under Rule 50.*