T.C. Memo. 1998-124

UNITED STATES TAX COURT

FRANCES L. AND GARY L. RAMBACHER, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 11443-96.                    Filed March 30, 1998.

<u>Paul G. Croushore</u>, for petitioners.

<u>Andrew M. Winkler</u>, for respondent.

MEMORANDUM OPINION

GOLDBERG, <u>Special Trial Judge</u>:  This case was heard pursuant
to section 7443A(b)(3) and Rules 180, 181, and 182.[1]  Respondent
determined additions to petitioners' Federal income tax for the

---

[1]     Unless otherwise indicated, all section references are to
the Internal Revenue Code in effect for the year in issue, and
all Rule references are to the Tax Court Rules of Practice and
Procedure.

year 1981 in the amount of $128 under section 6653(a)(1) and for 50 percent of the interest due on the underpayment of income tax assessed in the amount of $2,564, pursuant to section 6653(a)(2), attributable to adjustments in the underlying partnership proceedings which resulted in automatic adjustments to petitioners' income pursuant to the provisions of the Tax Equity & Fiscal Responsibility Act of 1982 (TEFRA), Pub. L. 97-248, 96 Stat. 324.

The issue for decision is whether petitioners are liable for additions to tax for negligence or intentional disregard of rules or regulations. Petitioners concede that the statute of limitations does not bar an assessment with respect to 1981.

Some of the facts have been stipulated and are so found. The stipulation of facts and the attached exhibits are incorporated herein by this reference. Petitioners resided in Ironton, Ohio, at the time that they filed their petition. References to petitioner are to Gary L. Rambacher.

In 1982 petitioner received a solicitation to purchase an interest in a limited partnership, Barrister Equipment Associates Series Ninety Eight (Series 98). Petitioner received a private placement memorandum and offering summary for Series 98. Petitioner received a private placement memorandum and offering summary for Barrister Equipment Associates Series 124 (Series 124) as well. Petitioner contacted Robert Gold, a general

partner involved with the promotion of the Barrister partnerships. In response to his inquiries, petitioner received another brochure that apparently addressed his remaining questions about the Barrister partnerships.

The record includes private placement memoranda for Series 98 and Series 124, and the offering summary for Barrister Equipment Associates Series 115 (Series 115). The parties have stipulated that the offering summary for Series 115 is essentially the same as the offering summaries for Series 98 and Series 124. According to the various materials, the partnerships were organized to lease literary properties for publication, distribution, and sale.

The private placement memoranda stated that the offerings were exempt from registration with the Securities and Exchange Commission. In addition, both warned that investment in the securities offered involved a high degree of risk and should not be purchased by anyone who could not afford the loss of their entire investment.

The offering summary included a chart identified as a "Typical Illustration of Anticipated Federal Tax Aspects For a Full Unit Investor". For a taxpayer in the 50-percent tax bracket, a full unit investment was projected to yield a tax savings of 4 times the amount of cash invested in the first year

and a tax savings of twice the amount of cash invested in the second year.

Under the lease agreements entered into by the partnerships, the partnerships were required to pay both a fixed rent and a variable rent during the first 2 lease years. The offering memoranda for Series 98 and Series 124 include summaries of lease payments and cash-flow analyses for the partnerships. The first part of the cash-flow analyses reflected the projected cash generated on the initial printings of the book properties based on net sales, the gross retail sales less the distributors discount, less rent. These analyses projected cash to partnership totaling $67,528 and $99,672 for Series 98 and Series 124, respectively. The analyses, however, failed to reduce cash for the fixed rent payments. In the first 2 years, fixed rents totaling $1,242,500 and $1,702,500 were payable by Series 98 and Series 124, respectively. Further, the offering summaries warned that although a cash-flow analysis was included in the offering materials, no representations or warranties were intended or should have been inferred as to any economic return. The Offering Memorandum disclosed that the capital contributions of the partners would be used in part to pay the fixed rents in the first 2 years.

The Private Placement Memorandum for Series 98 stated:

> In order for the Partnership to realize sufficient revenues from sales of the Books (after the payment of

distribution costs) to satisfy the lease payments for the Book Properties relating to each Literary Work a very substantial number of Books will have to be sold.  * * * The number of Books required to be sold to return a profit to the Partnership in almost all cases greatly exceeds the industry average. * * *
Accordingly, there is a high degree of probability that exploitation of the Book Properties relating to any one of the Literary Works will not yield a profit to the Partnership and that an investor may not recoup all or any portion of his cash investment in the Partnership.

Similarly, the Memorandum for Series 124 stated:

Although the appraisals support the value of Properties on both the Lessor and Partnership levels, there is no guarantee that all or any of the Books or Disks will achieve the level of sales necessary to result in Partnership profits.  The Services Contractors have agreed to use their best efforts but are not bound by any minimum performance requirement.

In addition, the private placement memoranda for Series 98 and Series 124 included unsigned proposed tax opinion letters.

The letter for Series 98 cautions:

Although the opinions may be deemed an indication of the fair market value of the Book Properties, they will be estimates only, and cannot be regarded as definitive with respect thereto.  It is highly likely that unless a Book achieves substantial sales, the IRS will not agree with the appraised value therefor.  We have made no independent investigation as to the fair market value of any of the Book Properties.

Petitioner decided to invest in Series 98 and Series 124 based upon the information contained in the offering materials. His review of these materials primarily focused on the cash-flow analyses and the proposed tax opinion letters.  Petitioners invested $6,250 in Series 98 in 1982, and in 1983 they invested $6,250 in Series 124.  Petitioners invested with others in the

partnerships through AB Trust and Equipment Investors which were listed as the partners on the Schedules K-1 issued by the partnerships.

Prior to investing in the Barrister partnerships, petitioners did not have any knowledge about the book publishing industry. Petitioner is a certified public accountant with 30 years of experience in public accounting. Mrs. Rambacher is an accountant and helps petitioner in his accounting practice. The bulk of petitioner's practice is devoted to tax and accounting work. Petitioners had some prior investment experience before investing in the Barrister partnerships. Their tax returns for the years in issue reflect dividend income, interest income, and capital gains from sales of stock.

Petitioner offered some advice to a few investors concerning the Barrister partnerships, and received fees from these persons for his analysis of financial data pertaining to the partnerships. Petitioner received a monetary rebate from Barrister for securing other investors, including his mother and brother, in the partnerships.

The partnership returns for Series 98 and Series 124 reported partnership losses and investment tax credit (ITC) basis in the following amounts:

| Series 98 | Loss | ITC Basis |
|-----------|------|-----------|
| 1982 | $480,725 | $13,515,000 |
| 1983 | 899,655 | 3,290,000 |
| Series 124 | | |

| | | |
|---|---|---|
| 1983 | 611,814 | 20,799,000 |
| 1984 | 1,235,173 | 4,117,230 |

The Schedules K-1 issued for AB Trust and Equipment investors reflect the following allocations:

| Series 98 | Loss | ITC Basis |
|---|---|---|
| 1982 | $7,880 | $221,551 |
| 1983 | 14,748 | 53,933 |
| Series 124 | | |
| 1983 | 11,330 | 385,177 |
| 1984 | 22,874 | 76,247 |

On their 1983 return, petitioners claimed flow-through losses of $4,896 from their interests in Series 98 and Series 124.  On Schedule E of their 1983 return, petitioners claimed net losses of $3,687 and $1,209, identifying "Barrister Equip." as the source of the losses and listing a corresponding partnership identification number for each loss.  On Form 3468 of their 1983 return and for purposes of computing the investment tax credit, petitioners listed total qualified investment in the amount of $43,970.  Petitioners claimed entitlement to a tentative investment tax credit of $4,397 subject to a tax liability limitation of $1,833 for 1983.  On August 24, 1984, petitioner filed Form 1045, Application for Tentative Refund, claiming an investment tax credit carry back of $2,564 from 1983 against their tax liability for 1981.

Respondent sent separate Notices of Beginning of Administrative Proceeding at the Partnership Level (NBAPP) and Notices of Final Partnership Administrative Adjustments (FPAA)

for tax years 1982 and 1983 for Series 98 to petitioners.
Respondent also sent separate NBAPP's and FPAA's for the tax
years 1983 and 1984 of Series 124 to petitioners.

The Court entered a stipulated decision in the underlying
partnership proceeding, Anderson Equip. Associates v.
Commissioner, at docket No. 27745-89, on February 17, 1995. The
decision provided that the losses claimed by Series 98 for 1982
and 1983 and Series 124 for 1983 and 1984 were not allowed, and
that the amount of qualified investment property held by Series
98 and Series 124 was zero for the aforementioned years as well.
Pursuant to section 7481, that decision became final on May 18,
1995, and, thereafter, respondent assessed taxes against
petitioners for 1981, 1982, 1983, and 1984 as computational
adjustments. On March 5, 1996, respondent issued a notice of
deficiency to petitioner for 1981.

Section 6653(a)(1) provides for an addition to tax equal to
5 percent of any underpayment if any part of the underpayment is
due to negligence or intentional disregard of rules or
regulations. Section 6653(a)(2) provides for an addition to tax
in the amount of 50 percent of the interest payable on the
portion of any underpayment of tax which is attributable to
negligence or intentional disregard of rules or regulations.
Negligence is defined as the lack of due care or the failure to
do what a reasonable and ordinarily prudent person would do under

the circumstances.  Neely v. Commissioner, 85 T.C. 934, 947 (1985).  Petitioners bear the burden of proving that no part of the underpayment for the year in issue was due to negligence or intentional disregard of rules or regulations.  Rule 142(a); Bixby v. Commissioner, 58 T.C. 757 (1972).

Petitioners contend that they exercised due care with respect to their investment in the Barrister partnerships because they reasonably relied upon the information contained in the offering materials.  Petitioners also contend that they were not negligent because they reasonably expected that the partnerships might be profitable.  Petitioners do not assert that they relied on any representations as to the tax treatment of the items passed through to them by the partnerships; rather their argument seems to be that if they were not imprudent in investing in the partnerships, then they were not negligent in claiming the deductions and investment tax credit basis flowing therefrom. Assuming arguendo that we agreed with this conclusion, petitioners have not established that they acted reasonably with respect to their investments in Series 98 and Series 124.

Petitioner testified that he completed a substantial evaluation of the potential profitability of the Barrister partnerships.  Petitioner, however, relied solely on the information contained in the offering materials, particularly the cash-flow analyses.  Reliance on representations by insiders,

promoters, or offering materials has been held an inadequate defense to negligence. Rybak v. Commissioner, 91 T.C. 524, 565 (1988); Freytag v. Commissioner, 89 T.C. 849, 889 (1987), affd. 904 F.2d 1011 (5th Cir. 1990), affd. 501 U.S. 868 (1991); Coggin v. Commissioner, T.C. Memo. 1993-209, affd. 71 F.3d 855 (11th Cir. 1996); Klieger v. Commissioner, T.C. Memo. 1992-734. In addition, a thorough review of the materials indicates that the cash-flow analyses were incomplete and could not be relied on as projections of income or loss or profitability of the partnerships. Furthermore, the offering materials contained numerous warnings and risks. Petitioner testified that he thought the tax opinion letters were conservative, but he gave no explanation for his conclusion. We think that the cautionary statements in the materials would have alerted a reasonable investor that the projected cash-flow, deductions, and credits of the partnership were questionable. See Estate of Hogard v. Commissioner, T.C. Memo. 1997-174.

Petitioner testified that he talked with Bob Gold, a general partner in one of the Barrister entities; however, petitioner could not recall the content of the conversations. Most, if not all of the conversations, occurred subsequent to petitioners' investment in the Barrister partnerships and apparently concerned the administrative proceedings at the partnership level. Thus, it does not appear that such action was aimed at monitoring

petitioners' investment.  See, e.g., Heasley v. Commissioner, 902 F.2d 380 (5th Cir. 1990), revg. T.C. Memo. 1988-408.

In addition, petitioners argue that they acted in good faith and disclosed sufficient information on their return, and therefore no additions should apply under section 6653(a). Petitioners rely on Belz Investment Co. v. Commissioner, 72 T.C. 1209 (1979), affd. 661 F.2d 76 (6th Cir. 1981); Wesley Heat Treating Co. v. Commissioner, 30 T.C. 10 (1958), affd. 267 F.2d 853 (7th Cir. 1959); Pullman, Inc. v. Commissioner, 8 T.C. 292 (1947); and Cryder v. Commissioner, T.C. Memo. 1977-103. Petitioner's reliance is misplaced.

Petitioners did not provide sufficient information to apprise respondent of their position on their return.  In fact, there is no reference on petitioners' return to the Barrister partnerships in respect of petitioners' claimed ITC.  We do not believe that the mere listing of tax identification numbers of the partnerships on Schedule E of their 1983 return constitutes sufficient information to apprise respondent that there was any issue with petitioners' treatment of the ITC.

Finally, petitioners argue that respondent has forced petitioners to petition this Court in an attempt to discern the basis for the deficiencies asserted against them.  Petitioner's argument seems to be that respondent should be equitably estopped from assessing the deficiencies.

Petitioners contend that they have made repeated attempts to find out the basis for respondent's position on the basis for the additions, starting as far back as 1986 or 1987. From the record, it does not appear that respondent has misled petitioners. Petitioners were informed of the partnership proceedings. The additions to tax were not determined until 1996, after the partnership proceedings were completed. Respondent could not give petitioners any explanation for the additions as far back as 1986 or 1987.

Petitioners argue that Fisher v. Commissioner, 45 F.3d 396 (10th Cir. 1995), revg. in part and remanding T.C. Memo. 1992-740, supports their position. Petitioners' reliance on Fisher v. Commissioner, supra, is also misplaced. That case involved a request for a waiver of additions to tax under section 6661(c). Based on the record, the Court of Appeals found that the Commissioner had not issued a denial with respect to the request, but instead had issued a notice of deficiency. The Court of Appeals reasoned that this Court could not have determined whether the Commissioner had abused his discretion in denying the waiver because no formal denial had ever been made; therefore, the case was remanded, and the Commissioner was ordered to reconsider the request for waiver and provide a written explanation for the decision. The Court did not hold that the Commissioner's failure resulted in waiver of the addition to tax.

13

We have considered all of the arguments and contentions presented by petitioners, and, to the extent not discussed above, we have found them to be without merit or not relevant. Respondent's determination is sustained.

To reflect the foregoing,

<u>Decision will be entered</u>

<u>for respondent</u>.